**UNITED STATES of America,
Appellant,**

v.

**Alice E. LEAHEY, Defendant, Appellee.
No. 7628.**

United States Court of Appeals,
First Circuit.

Oct. 7, 1970.

Willie J. Davis, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on brief, for appellant.

Thomas M. Mawn, Jr., Woburn, Mass., for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The issue presented by this case concerns the failure of the Internal Revenue Service (I.R.S.) to follow its own published general procedure, requiring its

15. Parsons v. Amerada Hess Corporation, 422 F.2d 610; Bartch v. United States, 330 F.2d 466.

Special Agents to give certain warnings on initial contacts with taxpayers they are investigating. More precisely, the question is: should the courts exclude evidence obtained from an interview where a Special Agent fails to give the warnings required by that procedure?

After several initial contacts with I.R.S. employees who were not Special Agents, appellee, Alice Leahey, was visited by Special Agents in her own home. Although they identified themselves, they failed to observe the I.R.S. announced procedure of warning her that they were investigating the possibility of criminal tax fraud. At a second visit when the Agents obtained bank statements and books from appellee, they also failed to give any warnings. Appellee was subsequently indicted and arraigned. She filed a motion to suppress the information and books and records obtained by the Special Agents on their two visits to her home. Relying on the general principle that due process requires government agencies to follow their specified procedures and on the Fourth Circuit opinion in United States v. Heffner, 420 F.2d 809 (4th Cir. 1969), the district court allowed appellee's motion to suppress. The government appeals.

Many courts and commentators have struggled with applying the due process limits on police interrogations to interviews conducted by the I.R.S. I.R.S. investigations differ from those of the police in several ways: they are usually, if not wholly civil, a hybrid civil-criminal investigation; suspects are rarely interrogated while in custody; and the focus is whether or not a crime has been committed as opposed to the normal police problem of identifying the perpetrator of a reported crime. Because of these differences, the rules governing police interrogations do not necessarily apply to interviews conducted by I.R.S. Agents. Although several commentators and a few courts have argued with some persuasiveness that the thrust of the Supreme Court's opinion in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that all taxpayers interviewed by I.R.S. Agents be warned of the potential criminal *implications* of a tax investigation,[1] this court has refused to require that the full panoply of *Miranda* warnings be given a taxpayer, not in custody, who is interviewed by I.R.S. agents.[2]

This difficulty of harmonizing non-custodial interviews conducted by I.R.S. Agents with the requirements of due process resulted in "a number of inquiries" to the I.R.S. As a result, the I.R.S. attempted to comply with the Court's request in *Miranda* for "increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws." 384 U.S. at 467, 86 S.Ct. at 1624. The I.R.S. publicly announced its new procedure in a news release on October 3, 1967.

1. Duke, Prosecutions for Attempts to Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1 (1966); Hewitt, The Constitutional Rights of the Taxpayer in A Fraud Investigation, 44 Taxes 660 (1966); Andres, The Right to Counsel in Criminal Tax Investigations Under Escobedo and Miranda: The "Critical Stage", 53 Iowa L.Rev. 1074 (1968); Note, Extending Miranda to Administrative Investigations, 56 Va.L.Rev. 690 (1970); United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969); United States v. Turzynski, 268 F.Supp. 847 (N.D.Ill.1967).

2. Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), aff'd, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969); Spinney v. United States, 385 F.2d 908 (1st Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); Schlinsky v. United States, 379 F.2d 735 (1st Cir. 1967), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967); Morgan v. United States, 377 F.2d 507 (1st Cir. 1967). Judge Heaney's opinion in Cohen v. United States, 405 F.2d 34. 37 n. 7 (8th Cir. 1969), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969), catalogues an extensive list of cases in most of the circuits upholding convictions even though the full *Miranda* warning was not given. In most of those cases, however, some minimal warning was given.

On initial contact, Agents are instructed to state, "As a special agent, I have the function of investigating the possibility of criminal tax fraud." If further investigation is required after preliminary inquiries, the Agent is required to advise the taxpayer of his rights to remain silent and to retain counsel. These procedures were adopted for the specific purpose of insuring "uniformity in protecting the Constitutional rights of all persons." We face for the first time a case to which this procedure was applicable but not applied.

The government challenges the district court's reliance on United States v. Heffner, 420 F.2d 809 (4th Cir. 1969), stating that the cases there relied upon all concerned adjudicatory proceedings.[3] It asserts that the strict rules of due process applicable to such proceedings do not apply to investigative proceedings; that agencies have no power to impose exclusionary rules on the courts; and that excluding admissions secured in violation of the I.R.S. announced procedure will result in "endless motions to suppress".

We consider first the impenetrability of these roadblocks and then search for any positive justification. The major argument advanced for reversal is the distinction, insofar as the applicability of due process rules of fair play are concerned, between adjudicative and investigative proceedings. It is quite true that the precedents relied on in *Heffner, see* n. 3 *supra*, as well as other cases,[4] involved adjudicative action by agencies. But the adjudicatory-investigatory dichotomy is a talisman only in the context of an agency hearing. In that context, the distinction is relevant to whether or not the agency is functioning like a court and hence must follow the due process rules that courts follow or whether it is functioning like a legislature and is bound by the lesser restrictions that govern investigative fact-finding. Thus, in Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), which the government quotes at length, the Supreme Court ruled that the Civil Rights Commission was not bound by the strict due process rules applicable to an adjudicatory agency because it was functioning in only an investigatory, fact-finding capacity in order that it might make legislative recommendations. We recently recognized the distinction central to *Hannah* in Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970).[5]

Here we are faced with the question of the limits which due process imposes on a police agency in the course of a criminal investigation. There can be no doubt that such investigations are subject to due process. As Mr. Justice Frankfurter said, speaking for the Court in McNabb v. United States, 318 U.S. 332, 343, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943), "A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process." In determining what limitations due process imposes on police agencies, it is not helpful to say that the due process requirements of adjudication are not imposed on agencies that conduct *legislative* investigations.

---

3. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

4. United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969).; Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); Dunmar v. Ailes, 121 U.S.App.D.C. 45, 348 F.2d 51 (1955); Smith v. Resor, 406 F.2d 141 (2d Cir. 1969).; American Broadcasting Co. v. F. C. C., 85 U.S.App. D.C. 343, 179 F.2d 437 (1949); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959); Pacific Molasses Co. v. F. T. C., 356 F.2d 386 (5th Cir. 1966); Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).

5. We there held when a government agency engaged in legislative-like fact-finding, persons affected were not entitled to the same due process rights which would have been available had the agency been engaged in adjudication.

The remaining barriers to our inquiry require less comment. The government cited United States v. Luna (W.D.Tex.), 313 F.Supp. 1294 (May 7, 1970), which held that administrative agencies may not "dictate preconditions for the admissibility of evidence in a federal trial". Of course we agree with the principle. But we cannot see its applicability. In form the I.R.S. announced procedure has nothing to do with admissibility. The decision as to the exclusionary implications of a violation of the procedure is ours, and based on our sense of the duties and rights so created. The crucial question is whether we must exclude this evidence so that agencies will be compelled to adhere to the standards of behavior that they have formally and purposely adopted in the light of the requirements of the Constitution, even though these standards may go somewhat further than the Constitution requires.

The government also raises the spector of endless motions to suppress, and hearings thereon, if we affirm. Yet it cites Cohen v. United States, 405 F.2d 34 (8th Cir. 1968), cert. denied, 394 U.S. 943, 90 S.Ct. 1274, 22 L.Ed.2d 478 (1969), which announced that failure of an Agent to comply with I.R.S. procedures will be "among the factors considered * * * in determining whether the nature of the investigation has been misrepresented." 405 F.2d at 39. Such an approach would seem to us to invite uncertainty and litigation. In contrast, a clear rule excluding admissions secured by an agent who has not conformed to required procedure would be more likely to decrease, rather than increase, the number of such motions and hearings.

What we have said does not answer our question. It merely gives us freedom to pursue it. We begin our search for a rationale by observing that the Court in Miranda, as we have noted, specifically asked law enforcement agencies to develop better ways of harmonizing the protection of individual rights with efficient enforcement of the law. The Service has tried to do this. We must assume that the publicly announced procedure was arrived at only after painstaking intra-agency assessment. Were we to say that Miranda is the ceiling rather than the floor of the rights of citizens vis-a-vis the government, we would make a mockery of the Miranda invitation.

Beyond this, we see a conjunction of two reasons why due process requires the I.R.S. to follow its announced procedures. The first is that announced in the press release itself—the objective of uniform conduct by all Agents. This is an objective shared by the Service, the public, and the courts. If this self-imposed rule of conduct could be violated without the sanction of judicial exclusion, what would be the result? Of course internal disciplinary measures would be available. But if the case or the culprit were important, and the disobedient officer's conduct resulted in a conviction, the court playing Pontius Pilate, we suspect that any penalties would be token. Indeed, if evidence obtained from such misconduct were not grounds for objection by defense counsel, or if the case never came to court, we doubt that violations would come to light. The I.R.S. has no great incentive to scrutinize carefully the conduct of interviews by its Agents, if the conduct does not affect the result of the prosecution. Indeed, an Agent's violation of these procedures in selective cases may benefit the agency. More important, citizens' faith in the even-handed administration of the laws would be eroded—just as much as if a municipality applied an ordinance only to a selected group. Cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

The second reason is that the I.R.S. press release was deliberately in response to "a number of inquiries" and avowedly for the purpose of "protecting the Constitutional rights of persons suspected of criminal tax fraud". When an agency "goes public" it does not do so lightly. Its obligations increase just as do those of a private corporation. This must be so since inquiry of personal, subjective knowledge of a person affected by a pro-

cedural dereliction is no more practicable than in the securities field. There is no way of assuring that, once the public announcement has been made, some alert taxpayers or their lawyers have not relied on it.

We do not say that agencies always violate due process when they fail to adhere to their procedures. It is important here that the procedure set forth in the news release was an agency wide directive designed to protect taxpayers by setting a clear and uniform standard governing the first contact between a Special Agent and a tax fraud suspect. Our result would have been different if the I.R.S. had violated a procedure designed to promote some other agency goal. Thus, if I.R.S. procedures stated that only trained Special Agents were to interview suspects, an interrogation which complied with all other procedures but was conducted by an accountant, would not seem to us to conflict with due process. Such a deviation from I.R.S. procedures would not deprive the person interviewed of protection that was afforded to other taxpayers; his interview would not differ significantly from others except that his questioner would be less adept. Only the efficiency of I.R.S. operations would be harmed. Unlike the situation here, the agency would gain no advantage from the selective unenforcement of its procedures, and the agency would have no disincentive to discipline the transgressing employee.

We further say that the public announcement of a procedure would not necessarily require exclusion of evidence obtained in violation thereof. For example, a procedure announcing that uniformed officials will conduct criminal investigations would not reasonably induce citizens to engage in criminal activity or to make incriminating statements in the presence of law enforcement officers who are not in uniform. No one has the right to commit a crime, even if misled by the government as to its enforcement methods. No one can complain of the internal authorization of known government interrogators if otherwise not likely to be misled as to the context of the questioning.

Here, however, we have the two factors intersecting: (1) a general guideline, deliberately devised, aiming at accomplishing uniform conduct of officials which affects the post-offense conduct of citizens involved in a criminal investigation; and (2) an equally deliberate public announcement, made in response to inquiries, on which many taxpayers and their advisors could reasonably and expectably rely. Under these circumstances we hold that the agency had a duty to conform to its procedure, that citizens have a right to rely on conformance, and that the courts must enforce both the right and duty.

Affirmed.