**UNITED STATES of America**

v.

**Leslie P. BEMBRIDGE.**

Crim. No. 71–587.

United States District Court,
D. Massachusetts.

Dec. 28, 1971.

James N. Gabriel, U. S. Atty., Wayne B. Hollingsworth, Asst. U. S. Atty., Boston, Mass., for Government.

James R. McGowan, Providence, R. I., for defendant.

## OPINION

WYZANSKI, Senior District Judge.

The United States District Attorney has filed against defendant an informa-tion charging that in the taxable years 1965, 1966 and 1967 he wilfully failed to file his personal income taxes in viola-tion of 26 U.S.C. § 7205.

Defendant, in advance of trial, moved to suppress the use in evidence of per-sonal papers [Exhibits E, F, G and H] he had delivered on December 9 and 18, 1968 and January 6 and 30, 1969 to Spe-cial Agent Donato Niro of the Intelli-gence Division of the Internal Revenue Service, and of all further evidence to which the papers led.

In the early months of 1968 three I. R.S. revenue agents visited defendant at his office to investigate his civil liabili-ties for income taxes theretofore due. It seems that they did not then examine the papers now in issue.

In December 1968 Special Agent Niro received an assignment authorizing him to investigate defendant's tax liability. We have no evidence as to whether the assignment was written or oral, or whether it embraced civil as well as criminal liability. This was the first as-signment which Special Agent Niro had handled without being closely super-vised.

On December 5, 1968 Niro and anoth-er agent went to defendant's office, but found he was away, and so from that of-fice Niro telephoned defendant to ask him to call Niro the next day so that an appointment could be arranged. The next day, defendant not having reached Niro, Niro telephoned him. They agreed on December 9 as the date for a meeting, and, to meet defendant's con-venience, the place selected was the I.R. S. office in Worcester. Niro told de-fendant to bring with him both his per-sonal books and records for 1965, 1966, and 1967, and the books and records for two years of a corporation of which de-fendant was chief executive officer. At that time Niro did not refer to the crim-inal nature of the investigation.

Defendant, armed with some but not all of the requested records, came to Niro's office at the time scheduled. Al-though he had a lawyer, he was unac-

companied. Niro promptly called to his office to join the conference an I.R.S. revenue officer, Mrs. Sara Hunt. It is agreed by these three persons that Niro did not use the precise words, "As a Special Agent, I have the function of investigating the possibility of criminal tax fraud," which appear in an October 3, 1967 I.R.S. News Release setting forth the duties of Special Agents to warn taxpayers. Nor did Niro "describe his function," as provided in another I.R.S. News Release of November 26, 1968. Niro testified, and this court finds, that he said to defendant that this was a criminal investigation. Mrs. Hunt testified that thereupon defendant repeated, with an emphatic inflection, the word "criminal"; but this court does not believe that this is an accurate or credible account. Neither Niro nor defendant has any such recollection; nor, apparently, is reference to it made in Niro's contemporaneous memorandum, which was not produced but was adverted to in the testimony. Niro did read aloud a somewhat abbreviated version of what are called the *Miranda* warnings, the omission being that defendant was free to stop his answers at any time.

In summary, this court finds that, partly because of the place where the conference occurred, partly because Niro used the word "criminal", and partly because of the recitation of the *Miranda* formularies, defendant, who, while he seemed to this court a not unusually alert or knowledgeable executive, had an above-average intelligence and business status, actually knew as he sat in the I.R.S. office at the very start of the conference, but not earlier, that a criminal investigation of his personal income taxes had begun. Having actual subjective knowledge, and not being merely chargeable with the knowledge which could objectively be attributed to any reasonable and prudent man under the circumstances, defendant thereafter handed to Niro on December 9 the papers comprising Exhibit E. Defendant had the same state of mind, but no further warnings, when at later dates he turned over to Niro Exhibits F, G and H.

In April 1969 Niro caused defendant to be served with a summons in a criminal tax proceeding investigating defendant's personal liability for the tax years 1967–1969. Upon receiving this summons, defendant for the first time got in touch with his lawyer with respect to this matter. The court finds that this was not the first time that defendant knew he was being subjected to criminal investigation but it was the first time that he felt sufficiently alarmed to consult his lawyer on the subject.

If it be material, this court further finds that Niro acted (1) in good faith, (2) without proven personal knowledge of the News Releases of October 3, 1967 and November 26, 1968, and (3) in compliance with the relevant manual of the I.R.S.; but this court also finds that if at the time Niro first established telephonic contact with defendant Niro had stressed that the investigation was criminal it is not clear whether defendant would have been compliant in coming with records to Niro's office. Obviously the defendant might have felt freer to stand on formalities at the outset than when he had already arrived at the I.R.S. office with his bundle of papers and was then at the last moment told that this was a criminal investigation. Withdrawal at that juncture probably would have aroused grave suspicion and almost guaranteed prosecution.

The foregoing facts bring this case squarely within the ruling in United States v. Leahey, 434 F.2d 7 (1st Cir. 1970), which as a matter of the "due process" guaranteed by the Fifth Amendment, precludes the use in evidence, or as a lead to evidence, of records which a taxpayer surrenders upon demand to a Special Agent of the I.R.S. who is conducting a criminal tax fraud investigation of the taxpayer, but who, before demanding the documents, fails to state to the taxpayer the magic words, "As a special agent, I have the function of investigating the possibility of criminal tax fraud," which the Octo-

ber 3, 1967 News Release had directed all Special Agents to use in such circumstances.

This lower court judge feels bound to apply that governing precedent, as well as the earlier case of United States v. Heffner, 420 F.2d 809 (4th Cir. 1969) [see also the later decision in United States v. Brod, 324 F.Supp. 800 (S.D. Tex., 1971), but see United States v. Luna, 313 F.Supp. 1294 (W.D.Tex., 1970)], and to leave the government, if it sees fit, to seek an appeal under 18 U.S.C. § 3731 to have the precedent distinguished or overruled. In view of Judge Coffin's statement at p. 10 of 434 F.2d that *Leahey* stands for "a clear rule excluding admissions secured by an agent who has not conformed to required procedure," this court does not believe an inferior court can distinguish this case on the plausible ground that after hearing the evidence it is satisfied that defendant had the equivalent of the required warning. The judges of the Court of Appeals made it explicit that "such an approach would seem to us to invite uncertainty and litigation." *Ibid.*

It is plain that here the precedent works a grave injustice. What it does, in effect, is to grant a taxpayer immunity from criminal prosecution solely because a minor I.R.S. official failed to recite every syllable of a mumbo-jumbo formula which a mere news release had indicated was proper. What the I.R.S. official failed to do was not an invasion of defendant's constitutional rights. It was not even a failure to accord defendant a right expressly or impliedly given to him by an I.R.S. regulation. Moreover, the defendant was given a warning which he understood as a statement that criminal proceedings were contemplated. To him, Niro's use of the word "mumbo" meant precisely the same as if Niro had said "mumbo-jumbo"—the magic formulary.

The only glimmer of merit in defendant's case is that if he had been given the warning not merely before he delivered the papers but before he sorted them out and brought them to Worcester, he might have talked to his lawyer, and then refused to come until he was formally served with a subpoena *duces tecum*. Had defendant taken that resistant attitude, it is doubtful whether Niro, acting alone, could have issued an effective subpoena. It is not clear that Niro had received authority to conduct both a civil and a criminal investigation so as to make valid a subpoena issued pursuant to 26 U.S.C. § 7602. See McGarry v. Riley, 363 F.2d 421 (1st Cir. 1966). If his authority was limited to a criminal investigation a subpoena issued by him might have been without statutory basis and invalid. See Reisman v. Caplin, 375 U.S. 440, 449, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). Cf. United States v. O'Connor, 118 F.Supp. 248 (D. Mass., 1953).

*Leahey* and other cases requiring the government as well as taxpayers to "turn square corners" may have the merit of raising the standard of administrative responsibility. But there are other ways of achieving such a laudable aim than to leave untried a supposititious violator of the tax laws who allegedly knew full well not only his conduct but also that at last the government was on his trail and was about to prosecute him. This court considers that, not having overreached the defendant or treated him unfairly, the government is entitled to bring him to the bar of justice. Moreover, this court believes that the present Supreme Court would not reach a different conclusion or interpret the due process clause of the Fifth Amendment as broadly as did the First Circuit in *Leahey*.

Motion granted to the extent that the government is ordered to return to defendant Exhibits E, F, G, and H, and not to use in any criminal or other proceeding those exhibits or any evidence directly or indirectly derived therefrom.