**UNITED STATES of America, Plaintiff,**

**v.**

**Leendert WOHLER, Defendant.**

**No. NCR 18–73.**

United States District Court, D. Utah, N. D.

Oct. 1, 1973.

C. Nelson Day, U. S. Atty., Michael M. Hunter, Asst. U. S. Atty., Salt Lake City, Utah, for plaintiff.

Orrin G. Hatch, David M. Swope, Salt Lake City, Utah, for defendant.

MEMORANDUM AND ORDER

ALDON J. ANDERSON, District Judge.

The defendant has been charged with several counts of income tax evasion in violation of 26 U.S.C. § 7201 and several counts of making and subscribing false

returns in violation of 26 U.S.C. § 7206(1). He has filed a motion to suppress certain evidence and to dismiss the indictment.

On May 5, 1970, Special Agent Harrington of the Intelligence Division of the Internal Revenue Service began an investigation into the defendant's potential tax liability with a view towards possible criminal prosecution. At the time Special Agent Harrington first contacted and interviewed the defendant he had been assigned to the case as a representative of the Intelligence Division which is charged with responsibility for investigating criminal violations of the tax laws. IRS procedures require the special agent to give the taxpayer a warning concerning his constitutional rights at the "initial meeting" with the taxpayer after such an assignment is made.

On May 6, 1970, pursuant to an earlier phone conversation with Special Agent Harrington and at his behest, the defendant brought certain of his tax records to the agent's office for a conference. At the beginning of the interview Special Agent Harrington endeavored to give the defendant a "Miranda-type" warning in accordance with IRS procedures as published for the benefit of the public in IRS news releases IR–897, and IR–949.[1] This dialogue follows:

Special Agent Harrington: As I told you on the phone, Mr. Wohler, I am a special agent with the Intelligence Division of the Internal Revenue Service.

Mr. Wohler: What does that mean?

Special Agent Harrington: Well, I'll tell you. One of the functions of the Intelligence Division of the Internal Revenue Service is to investigate criminal violations of the Internal Revenue Code. Before asking you any questions, I would like to tell you of your rights under the Fifth Amendment of the United States Constitution. You have the right to refuse to answer any questions and anything you do say could be used against you in court or other proceedings brought against you by the United States Government. You have a right to consult an attorney before answering any questions and you have a right to have an attorney present during this interview or any other interview we might have. Would you give here your full name?

Mr. Wohler: Leo Leendert Arnoldus Wohler.

Special Agent Harrington: Okay. . . .

This warning satisfied the requirements of the previously-mentioned news release except that the defendant was not in-

1. IR–949 provides:

Changes in the procedure for advising taxpayers of their rights during an investigation conducted by a Special Agent of the IRS Intelligence Division were announced today by the Internal Revenue Service.

The new procedure goes beyond most legal requirements that are designed to advise persons of their rights.

One function of a Special Agent is to investigate possible criminal violations of Internal Revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding.

Previously, the Special Agent identified himself and described his function at the *first meeting with the taxpayer* but was not required to give further advice unless the taxpayer was in custody or the investigation proceeded beyond the preliminary stage.

IRS has made no change in its existing instructions that if it becomes necessary to interview a person who is in custody, an Agent must give a comprehensive statement of rights before any interrogation.

formed of his right to refuse to produce his documents for agency perusal.[2] At the conclusion of the initial conference the following conversation took place:

Special Agent Harrington: What I would like to do now, and of course this is up to you and as I told you before you don't have to submit anything to me, but I would like to give you a receipt for the items you have there (referring to Mr. Wohler's records) and I would like to keep it for a few days and look at it. Is that all right?

Mr. Wohler: I would assume so.

Special Agent Harrington: Now of course this is up to you. It's not up to me. In other word (sic), I cannot force you to do it.

Mr. Wohler: Yes.

Some six months later the records were returned to the defendant who then retained Mr. Bill Bayes, a Certified Public Accountant, to assist him in this matter. During the defendant's subsequent discussion with the IRS, Mr. Bayes played an active role. As a result of a conference held between the accountant, the special agent, and the defendant, Mr. Bayes was directed to reconcile the defendant's financial statements with his tax returns. At the special agent's request, he was given the accountant's worksheets. Additional exchanges took place and a revenue agent was called in. According to the affidavits of Mr. Bayes and the defendant, IRS agents created the impression that this was a civil matter. Mr. Bayes stated that he formulated the opinion that this was a civil controversy on the basis of three factors: (1) that a revenue agent was called in to compute the tax owing on the basis of the "evidence" he had submitted; (2) he was informed that "all my future dealings" would be with a revenue agent rather than a special agent; and (3) Mr. Bayes asked Special Agent Harrington if his client should consult an attorney, and was informed that it was not necessary "at this time." [3] Subsequently, the defendant was indicted.

The defendant contends that the warning given him concerning his constitutional rights was defective in three respects. First, because the warning given the taxpayer was not given at the "initial meeting" as required by IRS procedure. Second, the defendant contends that the warning was not as complete as that required by IRS news release IR–949, issued November 26, 1968. Third, and finally, because the warning given did not conform to the standards of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) as required by United States v. Lockyer, 448 F.2d 417 (10th Cir. 1971), and United States v. Wainwright, 284 F.Supp. 129 (D.Colo.1968). The defendant also maintains that the United States obtained evidence said to be incriminating through misrepresentation, fraud, deceit, or other misconduct in violation of his rights under the Fourth and Fifth Amendments.

2. A troublesome point, however, concerns the lack of time that the defendant was given to weigh the implications of the warning. An examination of the record indicates that the questioning appears to have commenced immediately upon the conclusion of the giving of the warning. While the record would not disclose the time allowed for reflection, it would be most helpful to the trier of fact if an inquiry were directed to the person being examined as to whether or not he understood his rights and whether he desired to proceed further. If this were done then one reviewing the record could more easily ascertain whether or not these were knowingly waived. Otherwise, as in this case, one must depend upon an assessment of the overall context to determine whether an intelligent waiver has taken place.

3. Although as the defendant's agent, it was not necessary for the IRS to inform the accountant of the nature of the proceeding, representations made to him should be considered as having been made to the defendant.

## I

## INITIAL MEETING

The special agent and the taxpayer held a telephone conversation on May 5, 1970, which resulted in the May 6, 1970, conference. According to the defendant, the "initial meeting" was thus the telephone conversation, and the failure at that time of the special agent to inform the defendant of his constitutional rights was a violation of the before-mentioned news release IR–949. No allegation has been made, however, that potentially incriminating information was elicited from the defendant during this telephone call. There are perhaps situations where a telephone conversation should properly be considered the initial meeting for purposes of delivering the required warning. Here, however, there is no indication that the taxpayer's right to remain silent was jeopardized. A warning was given before any pertinent information was disclosed by the taxpayer, and this is all that is required.

## II

## COMPLIANCE WITH IRS PROCEDURES

Public concern and inquiry regarding the "hybrid civil-criminal" nature of tax investigation prompted the Internal Revenue Service to issue news releases IR–897 and IR–949. Because the procedures announced in these releases are for the benefit of the taxpayer and designed to encourage his reliance, assuring agency compliance with these procedures is a matter of judicial concern. This court is in agreement with previous decisions from other jurisdictions holding that the IRS agents are obligated to comply with the term of these releases. United States v. Leahey, 434 F.2d 7 (1st Cir. 1970); United States v. Heffner, 420 F.2d 809 (4th Cir. 1969). Cases in this circuit also suggest agreement with this position. *See* Rosenberg v. Commissioner of Internal Revenue, 450 F.2d 529 (10th Cir. 1971); United States v. Lockyer, 448 F.2d 417 (10th Cir. 1971).

The warning given taxpayers by special agents should be carefully scrutinized to assure that the taxpayer's rights are protected, and to ensure full compliance with administrative procedures. Such examination, however, should not be permitted to form the basis for objection to agency investigations, where a complete warning has in fact been given, although not in a memorized fashion. United States v. Bembridge, 458 F.2d 1262 (1st Cir. 1972).

In the present case, a warning satisfying the requirements of stated IRS procedures was given. At the outset of the interview, the warning Special Agent Harrington gave the defendant covered each specific point of procedure except informing him that he could not be required to produce his documents for inspection. However, as is evident from the recitation of the facts of this matter, the defendant was informed of this right prior to the time that he relinquished his records to the special agent. Thus, although the warning was a little disjointed in point of time, it was sufficient to satisfy the requirements of IRS procedure in apprising the defendant of his rights. It should be noted, however, that although exactitude in wording is not required, any deviance, discrepancy, or omission prejudicing the taxpayer is adequate justification for imposing restrictions upon the use of information obtained in such circumstances.

## III

## THE NATURE OF THE WARNING REQUIRED IN TAX PROCEEDINGS

Because of the dual civil-criminal nature of most tax investigations, the question of when a taxpayer should be warned concerning his constitutional rights is perplexing. The terms "custody" and "deprived of his freedom of action *in any significant way*" often appear to be an incongruity in tax pro-

ceedings concerning when the *Miranda* warning should be given. This question has not been resolved by the United States Supreme Court, and there is a difference of opinion among the courts which have considered the matter.

The majority view is that despite the unique nature of a tax investigation it is not necessary to give the taxpayer the *Miranda* warning unless he is in custody or otherwise deprived of his freedom in a significant manner. United States v. Miriani, 422 F.2d 150 (6th Cir. 1970) and cases cited therein. The majority viewpoint is that it is the inherently compulsive nature of the setting which requires a warning to be given, not the "strength or extent of the government's suspicion" at the time of interrogation. United States v. Squeri, 398 F.2d 785, 790 (2nd Cir. 1968).

The minority view is that a taxpayer becomes an "accused" when his case is referred to the Intelligence Division of the Internal Revenue Service, and that a warning concerning the taxpayer's constitutional rights is then required. As was noted in United States v. Turzynski, 268 F.Supp. 847 (N.D.Ill.1967), at 850:

> To hold otherwise would lead to the anomalous conclusion that a person suspected of bank robbery, sale of narcotics, murder, rape or other serious crime is entitled to greater protection of his constitutional rights than a person suspected of violating the internal revenue laws. For when the silent transition from civil to criminal investigation takes place in a tax case, the taxpayer being interrogated and asked to furnish his books and records is just as surely a prime suspect and candidate for criminal prosecution as the individual under interrogation as a suspect for other crimes.

The opinion goes on at 851 to indicate:

. . . . . . .

> In some respects the tax investigation is more insidious and dishonest than the custodial interrogation, for the suspect in custody well knows his interrogators are seeking evidence to convict him of a crime while a tax suspect is permitted and even encouraged to believe that no criminal prosecution is in contemplation.

Courts approving this position restrict the use of information obtained without first warning the taxpayer because it is "procured in violation of fundamental standards of fairness." United States v. Wainwright, *supra* 284 F.Supp. at 132.

This circuit has not ruled on this question although it has been discussed in several cases. In Hensley v. United States, 406 F.2d 481 (10th Cir. 1968), the Tenth Circuit Court of Appeals noted that Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) made it clear that *Miranda* applied to tax investigations, but did not appear to broaden the application beyond custodial interrogations. It was, however, not necessary to resolve the issue because the information obtained was in the form of corporate records not protected by the Fifth Amendment. *Hensley, supra* 406 F.2d at 484–485. In United States v. Lockyer, *supra,* the court reversed a district court decision ordering the suppression of certain evidence because of a failure of IRS agents to comply with internal agency procedures. At this time, however, it was noted that the "better reasoned cases" required that the taxpayer be given a warning concerning his constitutional rights "at the inception of the first contact" after the case is assigned to the Intelligence Division. *Lockyer, supra* 448 F.2d at 422. Further consideration was given this question in United States v. Merrick, 464 F.2d 1087 (10th Cir. 1972), and United States v. Michals, 469 F.2d 215 (10th Cir. 1972). *Merrick* and *Michals* note the conflicting lines of cases, but do not purport to resolve the issue. Thus, although this court is not constrained by judicial precedent, it is in agreement with Judge Doyle's observation in *Lockyer, supra,* that the better reasoned result is to require that the taxpayer be given a warning concerning his constitutional rights.

The seeming disagreement between the majority and minority viewpoints is not as pronounced as it appears. In United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969), a case holding that a warning is required, it was pointed out that in almost every case cited in support of the majority rule, some warning was in fact given. In *Wainwright, supra* 284 F.Supp. at 131–132 other of these cases were also distinguished. Thus it can be fairly said that many courts have determined that some form of warning is necessary, but for the most part are unwilling to require that the requirements of *Miranda* must be satisfied because of the burden this would impose upon routine tax and administrative inquiries. In Morgan v. United States, 377 F.2d 507 (1st Cir. 1967), a taxpayer was informed of his right to remain silent and that anything he said could be used against him, but was not informed of his right to counsel. In affirming the district court's conclusion that this did not violate the taxpayer's constitutional rights, the circuit court in *Morgan, supra* 377 F.2d at 508 observed:

> There must be reasonable limits to the solicitude required of the government. . . . If the government were obliged to inform a defendant that he was entitled to counsel, presumably it would equally be obliged to supply one if he was financially disabled.
>
> . . . . . .
>
> . . . [T]o say that a government agency must be prepared to suggest, and perhaps supply, counsel at every turn that it asks questions of someone, in addition to advising that there is no need to answer and warning of the possibility of self incrimination, we think goes far beyond any principle of fundamental fairness, and would be an uncalled-for departure.

Although agreeing in principle with the court in *Morgan* that reasonable latitude should be permitted in governmental investigations, it does not follow that requiring the government to inform the taxpayer of his Sixth Amendment right to counsel invariably requires the government to provide counsel to the indigent taxpayer in a non-custodial situation. As a minimum, fundamental fairness requires that the *Miranda* warning be given in the custodial situation and that the assistance of counsel be provided. This does not mean that the standard in non-custodial proceedings is necessarily the same or that no warning can be required in such circumstances. Of necessity, the standard must be flexible.

The setting where a taxpayer is interrogated concerning his tax history often, because of the nature of the proceeding, is pervaded with a compulsive aura. Although the taxpayer may be free to go or to refuse to answer any questions, he may not know this. Where the taxpayer is suspected of criminal misconduct, to allow the government to interrogate him or examine his records without somewhat informing the taxpayer of his rights would seem to violate basic notions of fairness.

Commendably, the Internal Revenue Service has recognized the inherent unfairness of this situation and, via the before-mentioned news releases, has endeavored to protect the constitutional rights of the taxpayer. Nothing less than the procedures required by the news releases will suffice in protecting the rights of the individual taxpayer.

Thus in this case the defendant's contention that the warning given him was inadequate because it did not completely comport with *Miranda* is not well taken. In the non-custodial tax investigation where the matter has been assigned to the Intelligence Division of the Internal Revenue Service, the warning required by published IRS news releases is sufficient to meet the standard of fundamental fairness required in such matters.

IV

## ALLEGATION OF MISREPRESENTATIONS

It does not appear from the facts that IRS agents fraudulently misled the defendant. Nevertheless, it is clear that as a result of the procedures followed by the agents the defendant was given the impression at some point that the controversy was now only civil in nature. This is evidenced by Special Agent Harrington's negative reply to the accountant's query concerning whether the defendant should obtain legal assistance.

If subsequent to the warning an agency is permitted via unsound procedures to mislead the taxpayer with impunity, the purpose for giving the warning is thwarted. Consequently, neither the good faith of the agent nor the intent of the agency justify misleading the taxpayer. Although the defendant initially cooperated with IRS agents, he maintains that he subsequently provided certain information because he was misled into believing that the probe was now only civil in nature. The facts indicate that he was misled and that the agency was responsible for his misapprehension.

The exact point in the investigation where agency representations were sufficient to justify the defendant's conclusion is not clear. Certainly the defendant's assumption was justified when Special Agent Harrington assured the defendant's agent that the defendant did not need an attorney. It is not clear at what point in the investigation prior to this assurance that the defendant was justified in assuming that the criminal inquiry had been dropped. It is clear, however, that the stage of the investigation when such an impression was proper was earlier than the time of Special Agent Harrington's representation to the accountant. Thus, in the interest of justice and to assure essential fairness, the court considers it necessary to order that the worksheets obtained from Mr. Bayes, and all other information subsequently obtained from the defendant and his accountant, be suppressed. Otherwise, the salutary purpose of the warning will not serve to protect constitutional rights as was intended.

Wherefore, it is hereby ordered that the before-mentioned evidence be suppressed and that in all other respects the defendant's motion is denied.